**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

JONEARL B. SMITH,

       Defendant - Appellant,

No. 10-3231
(D. Kan.)
(D.C. No. 6:07-CR-10142-JTM-4 )

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **MATHESON**, Circuit Judge.

Jonearl Smith was convicted by a jury of conspiring to engage in a racketeer

influenced and corrupt organization (RICO) enterprise in violation of 18 U.S.C. §

1962(d) and conspiracy to distribute 50 grams or more of crack cocaine in violation of 21

U.S.C. §§ 841 and 846.  He seeks reversal of both convictions based on insufficiency of

the evidence, erroneous jury instructions, and juror misconduct.  We affirm.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

# I. FACTUAL BACKGROUND

We provide only a brief background of the facts here; other pertinent facts will be set forth in the discussion of the issues.

Smith is a member of the Crips street gang in Wichita, Kansas. The Crips gang consists of several sets including the "Neighborhood Crips," the "Insane Crips," and the "Tre Five Seven Crips." The Neighborhood Crips have further subsets—the "Rolling 60's", the "Deuce Trey Crips" and the "Grove Block Crips." The Grove Block Crips are further divided into the "19s" and "17s," which refer to streets in Wichita. Smith is a member of the Neighborhood Crips, Grove Block, 19s.

There is no single leader of all the Crips in Wichita. However, each set of Crips has its own leaders. A leader is called an "OG," meaning "Original Gangster." (R. Vol. 2, Part 4 at 1043.) An OG is either a founder of the gang or someone who has earned the respect of fellow gang members. To join the Crips, an individual is either "jumped in" (physically beaten by other Crips members) or "blessed in" (no beating) if he is a relative or close friend of another gang member. (R. Vol. 2, Part 3 at 712.)

Crips members are required to "put in work" which means they are required to engage in various acts of retaliation (including fist fights and drive-by shootings) against rival gangs. (R. Vol. 2, Part 3 at 733.) They frequently carry guns and engage in other criminal behavior such as drug dealing and robberies. Smith has been found in possession of a gun on a number of occasions and robbed a retail store during which he shot an employee. He also was involved in drug dealing (which we will set forth in more detail in Section III(B)).

Crips have certain unwritten rules. Chief among them is not to snitch on other Crips members and to represent and defend the gang. Crips are also not to steal from other Crips or associate with rival gang members. The Crips hold "court in the streets." (R. Vol. 2, Part 4 at 1090.) If a member violates the rules, he is subject to a "violation." (R. Vol. 2, Part 3 at 739.) A "violation" usually involves being physically beaten by other Crips members but in some circumstances may involve being kicked out of the gang.

Crips hold meetings called "Cripnics" or "Cripcues." (R. Vol. 2, Part 5 at 1234, Part 9 at 2132.) Initially, they met at various residences; eventually they began meeting at local parks. At these meetings, Crips initiate new members into the gang, impose "violations" on certain members and discuss rival gangs.

Crips have unique hand signs and handshakes. They also frequently wear blue clothing to represent their membership.

## II. PROCEDURAL BACKGROUND

Smith, along with nineteen co-defendants, was charged in a 34-count Fifth Superseding Indictment. Smith was named in four counts: (1) participating in a RICO enterprise in violation of 18 U.S.C. § 1962(c) (Count 1); (2) conspiracy to participate in a RICO enterprise in violation of 18 U.S.C. § 1962(d) (Count 2); (3) conspiracy to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. §§ 841 and 846 (Count 28); and (4) conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846 (Count 29).

Smith proceeded to trial with five co-defendants. After a lengthy trial, where the

government called over 100 witnesses, the jury found him guilty on Counts 2 and 28 (RICO conspiracy and conspiracy to distribute crack cocaine), acquitted him on Count 29 (conspiracy to distribute marijuana), and deadlocked on Count 1 (RICO substantive violation). The district court denied Smith's post-trial motion for judgment of acquittal or in the alternative for a new trial. Smith was sentenced to 77 months imprisonment.

## III. DISCUSSION

Smith raises six claims which we distill to five: Whether (1) the government was required to demonstrate the existence of an enterprise in order to convict Smith of conspiracy to participate in a RICO enterprise under 18 U.S.C. § 1962(d); (2) the government presented sufficient evidence to support Smith's conviction for conspiracy to distribute 50 grams or more of crack cocaine; (3) Smith's requested jury instructions should have been given; (4) an evidentiary hearing was required regarding alleged juror misconduct; and (5) Smith's conviction of conspiracy to participate in a RICO enterprise should have been vacated after his convictions for the predicate acts supporting that conviction were set aside in a separate case.

A.      Existence of an Enterprise

The court instructed the jury (Instruction No. 32) that in order to find Smith guilty of conspiracy to participate in a RICO enterprise, the government must prove, *inter alia*, that "[a] conspiracy or agreement . . . existed between two or more persons *to participate in the affairs of an enterprise* that affected interstate commerce through a pattern of racketeering activity." (R. Vol. 1 at 206 (emphasis added).) The jury was also told that the term "enterprise" had the same meaning as that used in Count 1—the substantive

- 4 -

RICO charge—which defined "enterprise" as, *inter alia*, a "group of people [who] have (1) a common purpose; and (2) an ongoing organization, either formal or informal; and (3) personnel who function as a continuing unit." (R. Vol. 1 at 172.) However, the jury was also instructed that "the conspiracy alleged in Count 2 is a different charge [than Count 1]" with "important distinctions." (R. Vol. 1 at 206.) Relevant here, the jury was told that unlike Count 1, "the government need not prove . . . the alleged enterprise was actually established" for purposes of Count 2. (R. Vol. 1 at 206-07.) Rather,

> [t]he essential nature of Count 2 is the conspiratorial agreement; the ultimate success or failure of the conspiracy is irrelevant. An offense is established if the government proves that, if the conspiracy [was] completed as contemplated and the enterprise established, that: 1) the defendant would be employed by or associated with the enterprise; and 2) that the enterprise affected interstate or foreign commerce.

(R. Vol. 1 at 207.) Smith did not object to this instruction.

> During deliberations, the jury sent the following question to the court:

> Does the enterprise in count 1 have to be established before we can come to a verdict on count 2? For example [Instruction 32] says the government need not prove the alleged enterprise was actually established yet the 1st element [of Instruction 32] says "to participate in the affairs of an enterprise" & the term[] "enterprise" ha[s] the same meaning as th[at] in Count 1.

(Supp. R. Vol. 1, Part 2 at 300.)

> The court discussed the appropriate response with the parties. It initially proposed responding as follows:

> No, your decision on Count 1 does not control your decision on Count 2. It is possible to find the defendant not guilty on Count 1, but guilty on Count 2, or guilty on Count 1 but not guilty on Count 2. Of course you may also find the defendant not guilty or guilty on both of those counts as well.

> Count 1 focusses on the actual existence of an enterprise as reflected in at least

- 5 -

two prior criminal predicate acts, while Count 2 focusses on the intent of two or more persons to accomplish such an enterprise regardless of whether the predicate acts occurred. You must read this answer in conjunction with all of the instructions I have given you.

(R. Vol. 3 at 76-77.) Smith objected to the proposed response, stating the jury should be directed to refer to the original jury instructions because they "contain the answer" and the court's proposed response places "undue emphasis [on] instructions that are already in the Court's original instructions." (*Id.* at 80-81.) The court then asked Smith: "[The proposed answer] may be unacceptable but [is it] wrong? . . . Is there a misstatement of law in [the proposed answer]?" (*Id.* at 81.) Smith replied: "Not to my knowledge . . . ." (*Id.*)

In response to Smith's objection as well as to those of his co-defendants, the court modified its response, retaining the first paragraph but eliminating the second paragraph. It also referred the jury to Instructions 23-28 and 32-33 (the instructions regarding Counts 1 and 2) and instructed the jury to "read this answer in conjunction with all of the instructions I have given you." (R. Supp. Vol. 1, Part 2 at 301.) Smith unsuccessfully renewed his objection to the modified response. The jury did not reach a verdict on the substantive RICO charge but found Smith guilty of RICO conspiracy.

Smith filed a post-trial motion for judgment of acquittal or in the alternative for a new trial. For the first time, he argued he could not be convicted of conspiracy to participate in a RICO enterprise (Count 2) without a jury finding that an enterprise existed. Therefore, he contended Instruction 32 which informed the jury that the government need not prove the alleged enterprise was actually established was erroneous.

- 6 -

Moreover, he claimed the jury's question regarding whether it needed to find the existence of an enterprise in order to convict on Count 2, coupled with the fact the jury did not reach a verdict on Count 1 (which explicitly required the government to show the existence of an enterprise), demonstrated the jury did not find the existence of an enterprise beyond a reasonable doubt. Consequently, he said there was insufficient evidence to support the jury's verdict on Count 2.

The district court denied the motion. It refused to speculate whether the reason the jury did not reach a verdict on Count 1 was due to it being unable to find the existence of an enterprise. In any event, it concluded Instruction 32 was not erroneous because a defendant can be convicted of conspiracy without being convicted of the underlying substantive offense. Moreover, it determined there was sufficient evidence at trial to support the jury's finding of an enterprise.

1.      Standard of Review

Smith repeats his arguments here—which essentially boil down to claiming the government must prove the existence of an enterprise in order to convict a defendant of a RICO conspiracy under 18 U.S.C. § 1962(d). The government contends Smith is not entitled to review of this issue because he invited the error below by not objecting to Instruction 32 or lodging a legal objection to the court's response to the jury's question. Indeed, in objecting to the court's proposed response to the jury's question, Smith stated the court should refer the jury to the original jury instructions, including Instruction 32, which informed the jury it need not find the existence of an actual enterprise in order to convict on Count 2. Even assuming we reach the merits of the issue, the government

says our review should be for plain error based on Smith's failure to object.

We disagree with the government that Smith is not entitled to review of this issue because he invited the error below. We distinguish between waiver and forfeiture. "[W]aiver is the intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotations omitted); it occurs when a party "deliberately considered the unraised issue and made an *intentional* decision to forego it." *United States v. Zubia-Torres*, 550 F.3d 1202, 1206 (10th Cir. 2008) (emphasis added). Forfeiture, on the other hand, "is the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 733. In other words, "waiver is accomplished by intent, but forfeiture comes about through neglect." *Zubia-Torres*, 550 F.3d at 1205 (quotations omitted). One who has waived a right is not entitled to appellate review whereas one who has forfeited a right obtains plain error review. *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009).

The invited error doctrine is a form of waiver. *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011). It "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *Id.* (quotations omitted); *see also United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000) ("The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error.") (quotations omitted). It prohibits a party "from lying in wait for potential mistakes, and then seeking to reverse the outcome of trial." *United States v. Oldbear*, 568 F.3d 814, 826 (10th Cir. 2009).

- 8 -

Smith did not object to Instruction 32. Nor did he propose that instruction to the court. Therefore, his failure to object constitutes a forfeiture, not an invited error. Smith's handling of the jury's question is a closer issue. The jury's question suggested it was confused as to whether Count 2 required proof of an enterprise to convict. And, in objecting to the court's proposed response, Smith told the court it should simply refer the jury to the original instructions. Those instructions included Instruction 32, which told the jury the government was not required to prove the actual existence of an enterprise in order to convict on Count 2. Moreover, the court's initial proposed response included a statement setting forth the difference between Count 1 and Count 2, *i.e.*, Count 1 requires the existence of an actual enterprise whereas Count 2 simply requires the intent of two or more persons to accomplish such an enterprise. And Smith stated this proposed response did not "to [his] knowledge" misstate the law. (R. Vol. 3 at 81.) Nevertheless, taken in context, these actions do not amount to invited error.

Smith did not affirmatively urge the court to inform the jury that an enterprise need not be established in order to convict on Count 2. Rather, his position was simply that the court should refer the jury to the original instructions so as not to place undue emphasis on certain instructions to the exclusion of others. While his actions teeter on the edge, they ultimately fall on the side of neglect, rather than intent. His failure to properly object to the jury's question is a forfeiture, rather than an invited error. Our review is for plain error.

Under the plain error test, Smith "must demonstrate the district court (1) committed error, (2) the error was plain, and (3) the plain error affected his substantial

rights.  If these factors are met, we may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011) (citation omitted).

2.     Analysis

Smith contends the government was required to prove the existence of an enterprise in order to convict him on Count 2.  The government disagrees, claiming all it was required to prove was Smith "*agree[d] to facilitate*" the commission of a substantive RICO offense.  (Appellee's Br. at 34.)  In the alternative, the government claims any error did not affect Smith's substantial rights because "the evidence overwhelmingly showed that the Crips qualified as an association-in-fact enterprise . . . ." (*Id.* at 39.)

Smith relies on our decision in *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009), to support his claim that the existence of an enterprise is an element of RICO conspiracy under 18 U.S.C. § 1962(d).  There, the defendant, a member of the King Mafia Disciples street gang, was convicted by a jury of a RICO conspiracy under 18 U.S.C. § 1962(d).  He argued the evidence was insufficient to support his conviction.  In analyzing that argument, we said a defendant can be convicted of a RICO conspiracy "upon proof that the defendant knew about or agreed to facilitate the commission of acts sufficient to establish a [18 U.S.C.] § 1962(c) violation." *Smith*, 413 F.3d at 1265.  We then incorporated the elements of the substantive offense (§ 1962(c)) into that definition, saying:

[W]e hold that in order to convict a defendant for violating § 1962(d), the

Government must prove beyond a reasonable doubt that the defendant: (1) by knowing about and agreeing to facilitate the commission of two or more acts (2) constituting a pattern (3) of racketeering activity (4) participates in (5) *an enterprise* (6) the activities of which affect interstate or foreign commerce.

*Id.* at 1266 (emphasis added). Because the defendant alleged, *inter alia*, that the government had failed to present sufficient evidence of the existence of a RICO enterprise, namely that the King Mafia Disciplines was an "enterprise," we analyzed that narrow issue, concluding the government had met its burden. *Id.* at 1266-68.

Smith also relies on decisions from the Third and Seventh Circuits. In *United States v. Riccobene*, the Third Circuit said: "To establish an 'enterprise' conspiracy [under § 1962(d)], the government must prove beyond a reasonable doubt *that an 'enterprise' did in fact exist*, and that the individual defendants knowingly agreed to participate in the 'enterprise' through a pattern of racketeering."[1] 709 F.2d 214, 220-21 (3d Cir. 1983) (emphasis added). In *United States v. Neapolitan*, the Seventh Circuit was

---

[1] The government says the Third Circuit has since renounced its view that a RICO conspiracy requires prove of the existence of an enterprise. It points to Instruction 6.18.1962D of the Third Circuit's Criminal Pattern Jury Instruction which explicitly states "the government is not required to prove that the alleged enterprise actually existed" in order to obtain a conviction for RICO conspiracy. *See* Third Circuit Model Criminal Jury Instructions, Instruct. 6.18.1962D. The comments to the instruction acknowledge that *Riccobene* stated to the contrary but refer to that statement as dicta and claim later Supreme Court cases, namely *Salinas v. United States*, discussed *infra*, and Third Circuit cases hold otherwise.

The government's reliance on the pattern jury instruction as demonstrating the Third Circuit has abandoned its holding in *Riccobene* is misplaced. The pattern jury instructions were drafted by a committee of judges. *See* Committee on Model Criminal Jury Instructions, Third Circuit. However, "[n]either the Court of Appeals nor any judge of that Court participated in the drafting of the model instructions and *the Court of Appeals has not in any manner approved the use of these instructions*." *Id.* at n.* (emphasis added).

called upon to decide whether a RICO conspiracy requires an agreement by the defendant to personally commit two predicate acts or rather merely an agreement by the defendant that members of the conspiracy will commit two predicate acts. 791 F.2d 489, 494 (7th Cir. 1986). The court concluded it was the latter. *Id.* at 497-98. To conclude otherwise, it reasoned, would require "a degree of involvement in the affairs of the conspiracy that is not required in any other type of conspiracy, where agreeing to a prescribed objective is sufficient." *Id.* at 498. While recognizing that RICO has been used more broadly than anticipated by its legislative history, the court emphasized two aspects of RICO conspiracy that limit its scope: (1) "the nature of the agreement required," i.e., "an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts," and (2) "*the necessity of proving the existence of an enterprise.*" *Id.* at 498-99 (emphasis added).

For its part, the government relies on *Salinas v. United States*, 522 U.S. 52 (1997), and *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237 (2009). Salinas, like Smith, was charged with both a substantive RICO violation and RICO conspiracy but only convicted of the latter. The question before the Court was whether a RICO conspiracy conviction requires proof that the defendant himself committed or agreed to commit the two predicate acts required for a substantive RICO violation under § 1962(c). *Salinas*, 522 U.S. at 61. In addressing the issue, the Court laid out the "predominant" elements of a § 1962(c) violation as "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity" and noted the statute defines "pattern of racketeering activity" as requiring at least two acts of racketeering, i.e., two predicate acts. *Id.* at 62.

Nevertheless, while a substantive RICO violation requires proof that the defendant himself committed two predicate acts, the Court determined nothing in the RICO conspiracy statute required proof that the defendant himself committed or agreed to commit two predicate acts. *Id.* at 63-64. That is because the RICO conspiracy statute (unlike the general conspiracy statute, 18 U.S.C. § 371) simply made it unlawful for any person to "conspire" to violate § 1962(c); there is no requirement of some overt or specific act in the statute. *Id.* at 63. And, under general conspiracy principles, while "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," he need not actually commit or agree to commit the substantive crime. *Id.* at 64-65. Indeed, "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Id.* at 65.

In *Boyle*, the Supreme Court held an association-in-fact enterprise must have at least three structural features—"a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit associates to pursue the enterprise's purpose." 129 S. Ct. at 2244. It rejected Boyle's attempt to demand more. *Id.* at 2245. It also rejected his argument that requiring more structure would prevent merger of § 1962(c) with conspiracy to commit one or more crimes listed as RICO predicate offenses under 18 U.S.C. § 371. *Id.* at 2246. The Court said:

> [P]roof that a defendant conspired to commit a RICO predicate offense—for example, arson—does not necessarily establish that the defendant participated in the affairs of an arson enterprise through a pattern of arson crimes. Under § 371, a

> conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy. Section 1962(c) demands much more: the creation of an "enterprise"—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses.

*Id.* (citation omitted).

None of the cases urged upon us resolve the question. Although *Smith* "held" and *Riccobene* said the existence of an enterprise was an element of a § 1926(d) violation, the issue was not before either court. Indeed, in both cases, it appears the jury was instructed that the government was required to prove the existence of an enterprise in order to convict for RICO conspiracy. On appeal, the government did not argue the instruction was erroneous; both parties apparently assumed an existing enterprise was a necessary element. Therefore, the "holding" in *Smith* and the statement in *Riccobene* are dicta. *See Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995) ("Dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.") (quotations omitted); *see also Smith v. Orr*, 855 F.2d 1544, 1550 (Fed. Cir. 1988) ("Broad language in an opinion, which language is unnecessary to the court's decision, cannot be considered binding authority."); *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) ("[D]ictum [is] a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding--that, being peripheral, may not have received the full and careful consideration of the court that uttered it.") (quotations omitted). While "a panel of this Court is bound by a *holding* of a prior panel of this Court[,] [it] is not bound by a prior panel's *dicta*." *Bates v. Dep't of*

*Corr. of State of Kan.*, 81 F.3d 1008, 1011 (10th Cir. 1996) (emphasis added). Moreover, *Riccobene* is an out of circuit decision, which is neither binding nor persuasive. *See Grimland v. United States*, 206 F.2d 599, 601 (10th Cir. 1953) (although decisions from other circuits "are persuasive and entitled to great weight," we are not bound by them).

Similarly, while *Salinas* suggests the actual existence of an enterprise is not necessary to establish a RICO conspiracy, the holding in *Salinas* was limited to deciding that a defendant need not himself commit or agree to commit the two requisite acts required for a substantive RICO offense under § 1962(c) in order to be convicted of RICO conspiracy under § 1962(d).[2]

Finally, neither *Neapolitan* nor *Boyle* is helpful. *Neapolitan*, another out-of-circuit decision, merely decided a RICO conspiracy requires an agreement by the defendant that members of the conspiracy will commit two predicate acts rather than an agreement by the defendant to personally commit two predicate acts. Therefore, its suggestion that RICO conspiracy requires the existence of an enterprise is also *dicta*. And *Boyle* simply addressed the requirements of an enterprise. Although it distinguished § 1962(c) and § 371 based in part on the fact the former requires the creation of an enterprise while the latter does not, it did not distinguish § 1962(c) and § 1962(d) on that basis. Rather, in

---

[2] Shortly before this case was heard, the Second Circuit decided *United States v. Applins*, 637 F.3d 59 (2d Cir. 2011). There, the court "concluded that *Salinas* counsels that the establishment of an enterprise is not an element of the RICO conspiracy offense." *Id.* at 75. While we agree *Salinas* suggests this, we need not decide the issue as our review is for plain error and *Salinas* is far from being clear or obvious on this issue. *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 818 (10th Cir. 2005) ("To be plain, an error must be clear or obvious under well-settled law.") (quotations omitted).

- 15 -

comparing these two statutes, the Court simply said "in practice" their elements "are similar."[3] *Boyle*, 129 S. Ct. at 2246.

"To be plain, an error must be clear or obvious under well-settled law." *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 818 (10th Cir. 2005) (quotations omitted). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011) (quotations omitted). Here, there is no controlling Supreme Court or Tenth Circuit precedent as to whether the existence of an enterprise is an element of a RICO conspiracy under § 1962(d). *Smith*, *Salinas* and *Boyle* are not on point. *See Story*, 635 F.3d at 1246, 1248 (stating Tenth Circuit case which addressed the issue in dicta did not constitute well-settled law for purposes of the plain error standard); *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (same). And *Riccobene* and *Neapolitan* are not only not on point but are also non-binding out-of-circuit decisions.

Even assuming, *arguendo*, there was plain error, we cannot say the error affected Smith's substantial rights (the third prong of the plain error test). For an error to have affected substantial rights, "the error must have been prejudicial: It must have affected

---

[3] In addressing the requirements of an enterprise, namely whether its structure must go "beyond that inherent in the pattern of racketeering activity," the Court noted that "[i]f the phrase is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct." *Boyle*, 129 S. Ct. at 2244-45. However, the Court was not necessarily referring to the elements of a RICO conspiracy as Boyle was also charged and convicted of a substantive RICO offense. *Id.* at 2241-42. In any event, Boyle merely addressed the requirements of an enterprise; it was not asked to determine whether an enterprise is a necessary element of a RICO conspiracy.

the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. The burden to establish prejudice to substantial rights is on the party failing to raise the issue below--Smith. *Id.*

At oral argument, Smith conceded the government presented evidence of an enterprise, *i.e.*, the Crips. Nevertheless, he claims the jury did not find the existence of an enterprise because it failed to reach a verdict on Count 1, which specifically required the jury to find the existence of an enterprise. He says the failure to prove the existence of an enterprise was the reason the jury did not convict on Count 1 and this is evident from (1) the jury's question asking whether the enterprise in Count 1 had to be established before it could render a verdict on Count 2 and the court's response "No" and (2) an e-mail received by a co-defendant's counsel from a juror after deliberations stating that there were only two jurors "that did not see the organization necessary to prove the [RICO] charge" and "[t]he only reason count 2 was decided the way it was, was because the government didn't have to prove anything actually happened." (Supp. R. Vol. 1, Part 2 at 322.)

Smith has failed to meet his burden of showing any error affected his substantial rights. The evidence overwhelmingly showed the existence of an enterprise—the Crips gang. The evidence demonstrated the Crips gang is an association-in-fact whose purpose is to engage in various acts of violence and intimidation as well as robberies and drug trafficking. It has leaders and rules of conduct (albeit unwritten) for its members. It also has its own "initiation procedures" and "justice system." It holds meetings. Members frequently wear blue clothing and use hand signals to indicate their membership.

Members protect other members and the reputation of the gang. *See Boyle*, 129 S. Ct. at 2244-45, 2247 (discussing necessary showing to establish RICO enterprise); *see also c.f. United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (concluding evidence was sufficient to show Elk Block street gang was a RICO enterprise—members congregated daily in their territory, marked their territory with graffiti, received tattoos signifying their membership, flashed the Elk Block hand sign to represent their membership, and had a common purpose (selling drugs and protecting their territory and other members)); *United States v. Phillips*, 239 F.3d 829, 844 (7th Cir. 2001) (finding government presented sufficient evidence that the Dawg Life gang was a RICO enterprise—gang was a long-established and ongoing organization with a definite structure and hierarchical decision-making process which was involved in drug distribution).

Smith speculates as to the reason the jury did not return a verdict on Count 1; insisting it was due to the government's failure to prove an enterprise. While the jury questioned whether the enterprise in Count 1 had to be established before a verdict could be reached on Count 2 and the court said "no," we cannot say with any confidence that a lack of proof on the existence of an enterprise was the reason for the jury's verdict on Count 1. Moreover, while the juror's e-mail letter to co-defendant's counsel indicates the lack of the existence of an enterprise was the reason for the jury's verdict on Count 1, Rule 606(b) of the Federal Rules of Evidence prevents us from considering that letter because it addresses a "matter . . . occurring during the course of the jury's deliberations" and the effect certain evidence, or a lack thereof, had on her and another's juror's "mind

- 18 -

or emotions."[4]  *See* Fed. R. Evid. 606(b);[5] *see also United States v. Benally*, 546 F.3d 1230, 1233 (10th Cir. 2008) ("[Rule 606(b)] insulates the deliberations of the jury from subsequent second-guessing by the judiciary. Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review.").

In sum, the district court did not plainly err but even if it did, the error did not affect Smith's substantial rights.

---

[4] There are three exceptions to the rule:  "[A] juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." Fed. R. Evid. 606(b).  None of these exceptions apply here.

[5] Effective December 1, 2011, Rule 606(b) was amended and divided into two subsections:

**Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**Exceptions.** A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Even under the amended rule, we cannot consider the juror's e-mail letter as it pertains to two jurors' "mental processes concerning the verdict" and none of the exceptions apply.

- 19 -

B.    Sufficiency of the Evidence on Count 28

Smith claims the government presented insufficient evidence to sustain his conviction on Count 28—conspiracy to distribute 50 grams or more of crack cocaine. According to Smith, the only evidence presented on this charge was testimony concerning two drug transactions he conducted with Detective Goodwyn. Because a conspiracy cannot exist between a defendant and a law enforcement officer, Smith contends the evidence cannot support his conviction. Even assuming Smith obtained the crack cocaine he sold Goodwyn from another Crips member, he contends that evidence only shows the existence of a buyer-seller relationship between Smith and the other Crips member, which is insufficient to establish a conspiracy. Smith also contends the evidence failed to establish his agreement with other Crips members to distribute crack cocaine, his knowing and voluntary participation in that agreement, or interdependence. He says the evidence established that Crips members who sold drugs did so for their own benefit—they did not share their drug profits with other Crips members and did not rely on other Crips members to make their sales. Finally, he claims even if there was evidence showing his knowing participation in a conspiracy to distribute drugs, his incarceration for approximately thirteen years of the alleged fifteen-year conspiracy constituted a withdrawal from the conspiracy.

> We review sufficiency-of-the-evidence challenges de novo, considering both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government. We may not disturb the jury's credibility determinations, nor weigh the evidence in performing this analysis. The evidence is sufficient under these tests if a reasonable jury could have found the defendant guilty beyond a reasonable doubt.

*United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir.), *cert. denied*, 132 S. Ct. 540 (2011) (citations and quotations omitted).

"To obtain a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy,* 641 F.3d 455, 465 (10th Cir.), *cert. denied*, 132 S. Ct. 467 (2011). An agreement to distribute drugs can be inferred from the facts and circumstances of the case. *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992). However, "mere presence is not sufficient in and of itself to establish a conspiracy, nor is it sufficient for the government to show only mere association with conspirators known to be involved in crime." *United States v. Caldwell*, 589 F.3d 1323, 1331 (10th Cir. 2009) (quotations omitted). "Likewise, the government must do more than show there were casual transactions between the defendant and the conspirators." *Id.* (quotations omitted).

Interdependence "requires proof that the conspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Hamilton*, 587 F.3d 1199, 1208 (10th Cir. 2009) (emphasis and quotations omitted). "The requirement is satisfied if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole." *Id.* (emphasis and quotations omitted); *see also United States v. Edwards,* 69 F.3d 419, 431 (10th Cir. 1995) ("[I]nterdependence exists where each co-conspirator['s] activities constituted essential

and integral steps toward the realization of a common, illicit goal."). However, the interdependence element does not require proof "the coconspirators know the identities or details of each scheme or have connections with all other members of the conspiracy." *Foy*, 641 F.3d at 465 (quotations omitted).

The government presented sufficient evidence to convict Smith on Count 28. First, the evidence showed the Crips gang engaged in drug dealing. Crips members have crack houses or "spots"-- residences where they "hang out," cook crack cocaine, and sell drugs. (R. Vol. 2, Part 5 at 1204.) Several Crips gang members testified to having purchased powder and crack cocaine from fellow Crips members and having sold powder or crack cocaine to other Crips members. Smith was a member of the Crips and well aware of the gang's activities.

Second, the evidence showed Smith dealt drugs. On June 14, 2006, Goodwyn learned from a source that Smith was selling cocaine. Goodwyn had the source set up a controlled buy with Smith. Going undercover, Goodwyn, accompanied by the source, purchased approximately four grams of powder cocaine from Smith for $120. Goodwyn asked Smith about purchasing larger amounts of powder and crack cocaine; Smith told him the prices. Two days later, Goodwyn bought 14 grams of crack cocaine from Smith for $300. They again talked about future purchases.

On October 19, 2006, officers observed Smith making a short visit to a crack house operated by fellow Crips members Elton Profit and Lonnie Wade. Officers stopped Smith's vehicle immediately thereafter. After Smith consented to a search of his vehicle, officers discovered 29.96 grams of crack cocaine under the vehicle's gas tank lid.

Officers also found $600 in cash in his pocket in numerous denominations.

Prentice Bryd, a fellow Crips member, testified to having started selling crack and powder cocaine in 2004. He sometimes gave powder or crack cocaine to other Crips so they could make money. He gave Smith 3.5 grams of crack cocaine to sell when Smith was released from prison and also sold Smith powder cocaine several times throughout 2006.

A search of Smith's residence on April 6, 2007, also connected him to drug trafficking. Officers uncovered a digital scale with white residue, letters to Smith from incarcerated Crips requesting cocaine and marijuana, and a bucket containing marijuana.[6]

A reasonable inference from this evidence is that Smith had an agreement with other Crips members, including Bryd, Wade and Profit, to distribute crack cocaine and he was a knowing and willing participant. Contrary to Smith's argument, the evidence consisted of more than just the transactions with Goodwyn or a buyer-seller relationship between Smith and another Crips member—the evidence showed a larger conspiracy among Crips members to distribute drugs, including crack cocaine, and that Smith was a knowing and willing member of that conspiracy.[7]

Smith contends the Crips members who testified at trial stated they sold drugs for their own personal profit, not to benefit the gang. Smith is referring to the testimony of

---

[6] Smith was incarcerated at the time of the search and had been so since his arrest on October 19, 2006.

[7] Several Crips members testified that while Crips smoke marijuana, they do not use crack cocaine as "crack heads" cannot be trusted. (R. Vol. 2, Part 9 at 2184.) A reasonable inference is that Smith's receipt of crack cocaine from Bryd, Wade and Profit was not for personal use.

Dontae Davis and Prentice Byrd. Davis testified he sold drugs for his own benefit and kept the proceeds; Byrd testified he provided drugs to other Crips members to sell for their own benefit. The fact Crips members did not share their profits is immaterial. The evidence showed Crips members sold either powder or crack cocaine to other Crips members. The buyers in turn would either sell the crack cocaine they obtained or cook the powder cocaine into crack cocaine and sell it. Therefore, the sellers and buyers acted together for their shared mutual benefit—the sellers profited from their sales to the buyers and the buyers in turn profited from their subsequent sales to consumers. Moreover, while Davis sold drugs for his own personal financial benefit, he also said he preferred to deal drugs with other Crips members to keep the money among them. He also trusted other Crips not to involve the police.

According to Smith, his extended periods of incarceration during the conspiracy period constituted withdrawal, but "[n]either arrest nor incarceration automatically triggers withdrawal from a conspiracy." *United States v. Fishman*, 645 F.3d 1175, 1196 (10th Cir.), *cert. denied* 2011 WL 5834667 (2012) (quotations omitted). Rather, "to withdraw from a conspiracy an individual must take affirmative action, either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach co-conspirators." *United States v. Parnell*, 581 F.2d 1374, 1384 (10th Cir. 1978). "[C]essation of activities alone is not enough." *Id.* The defendant bears the burden of establishing withdrawal. *Id.*

Other than showing he was only out of prison intermittently for 2½ years of the fifteen-year conspiracy (which the government stipulated to), Smith failed to show he

took any affirmative action to withdraw from the conspiracy. Indeed, Byrd testified he gave Smith 3.5 grams of crack cocaine to sell after Smith was released from prison. Moreover, the search of Smith's residence revealed several letters from incarcerated Crips seeking drugs. A reasonable inference from this evidence is that incarceration did not stop drug dealing.[8]

C.     Denial of Requested Jury Instructions

Smith requested jury instructions informing the jury that "[a] government agent cannot serve as the second party in a conspiracy to distribute drugs" and "[t]here can be no conspiracy established by proving a mere buyer-seller relationship between the defendant Jonearl Smith and the purchaser, officer Ron Goodwyn." (Supp. R. Vol. 1, Part 2 at 286-87.) The district court refused the requested instructions. Error, Smith claims, because the only evidence of the alleged conspiracy was his sale of crack cocaine to Goodwyn on two occasions. According to him, refusing the requested instructions led the jury to wrongfully believe he entered into a conspiracy to sell crack cocaine with Goodwyn.

> We review a district court's refusal to give a requested instruction for abuse of
> discretion. In assessing whether the district court exercised its discretion properly,

---

[8] Importantly, the jury was instructed that a defendant may withdraw from a conspiracy if he shows "some affirmative action taken to disavow or defeat the purpose of the conspiracy." (R. Vol. 1 at 156.) It was also told it could "consider evidence of an individual's imprisonment during the course of the conspiracy on the issue of withdrawal." (*Id.*) Despite these instructions and hearing evidence in the form of a stipulation that Smith had been in prison for almost thirteen years of the fifteen-year conspiracy, the jury nevertheless found him guilty on Count 28. As stated above, the evidence supports the jury's implicit conclusion that Smith's imprisonment did not constitute withdrawal.

we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.

A defendant is entitled to an instruction on his theory of the case if the instruction is a correct statement of the law, and if he has offered sufficient evidence for the jury to find in his favor.

*United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006) (citations omitted).

Smith does not contest the legal accuracy of the instructions given on Count 2. Rather, he believes his requested instructions were necessary to prevent the jury from convicting him based on a supposed conspiracy with Goodwyn.

"It is settled law in this circuit that proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy." *See United States v. Williamson*, 53 F.3d 1500, 1518 (10th Cir. 1995) (quotations omitted). However, this rule only applies to the buyer. *See United States v. Flores*, 149 F.3d 1272, 1277 (10th Cir. 1998) (explaining "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy"; concluding the buyer-seller rule did not apply to defendant who was not a purchaser but a seller of drugs) (quotations omitted); *see also United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990) ("We have held that proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy.  One who merely purchases drugs or other property from a conspirator does not thereby become a member of the conspiracy. The reason is that guilt remains individual and personal, even as respects conspiracies, and is not a matter of

- 26 -

mass application.") (citations and quotations omitted). In this case, Smith was the seller in the drug transactions with Goodwyn. Thus, the evidence did not support giving the requested "buyer-seller relationship" instruction.

As to the other requested instruction, it correctly states the law. *See United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir. 1985) ("[T]here can be no indictable conspiracy involving only the defendant and government agents or informers."). However, even assuming the court erred in not giving the instruction, any error was harmless beyond a reasonable doubt. *See United States v. Smith*, 888 F.2d 720, 723 (10th Cir. 1989) (failure to give a requested jury instruction is reviewed for harmless error; "[i]n doing so, we must determine whether we can declare a belief that failure to give [a requested instruction] was harmless beyond a reasonable doubt.") (quotations omitted); *see also United States v. Schuler*, 458 F.3d 1148, 1156 (10th Cir. 2006) ("Reversal of a conviction is warranted only where the failure to give an instruction is prejudicial in view of the entire record."). Contrary to Smith's contention and as demonstrated above (*see* Section III(B)), the government's evidence of Smith's participation in the alleged conspiracy consisted of more than just his drug transactions with Goodwyn; it showed he conspired with other Crips members, including Byrd, Wade and Profit, to distribute crack cocaine.

D.    Denial of Evidentiary Hearing on Jury Misconduct

The jury began its deliberations on March 30, 2009. On April 8, 2009, the jury informed the court it had reached a verdict on sixteen counts but were at an impasse on

the remaining eighteen counts.[9]  The court then gave a modified *Allen*[10] instruction.  On

the afternoon of April 14, 2009, the jury informed the court that "after <u>strongly</u>

considering [the *Allen* instruction]," it had reached a verdict on twenty-six counts but

were still at an impasse on eight counts.  (Supp. R. Vol. 1, Part 2 at 305.)  The court did

not answer the jury's question.  The next morning, the jury returned a verdict on all but

six counts.[11]

Immediately after the jury's verdict was accepted and the jury discharged, the

court allowed the jury to meet with counsel from both sides to discuss the case.  At that

time, the presiding juror provided a typed letter to government's counsel thanking them

and praising them for their handling of the case.  The juror also offered to meet with

government's counsel to discuss the case, jury deliberations and "anything else that may

help you in an effort to rid this cancer in our society."  (Supp. R. Vol. 1, Part 2 at 321.)

The next day, another juror sent an e-mail to a co-defendant's counsel.  The e-mail

stated in relevant part:

To be perfectly honest, when I entered deliberations, I was prepared to vote

---

[9] The indictment alleged thirty counts.  However, because some counts pertained
to more than one defendant, while others applied only to one defendant, the number of
"counts" or findings the jury had to make was thirty-four.

[10] *See Allen v. United States*, 164 U.S. 492, 501 (1896).

[11] It is unclear from the record whether the jury continued to deliberate after
informing the court on the afternoon of April 14th that it had reached a verdict on all but
eight counts or before the verdict was taken on April 15th.  The record only indicates the
question was written at 2:35 pm on the 14th and the court took the verdict the next
morning at 8:30 am.  The fact the ultimate verdict was rendered on all but six counts
indicates further deliberations may have occurred either on the afternoon of the 14th or
the morning of the 15th, unless the jury's letter included a miscalculation.

everyone not guilty. It was with a heavy heart that I made some of the decisions I made, especially in regards to your client. I came to the quick realization that apparently my view of the law was different tha[n] most of the other jurors, and ironically that of the law itself. I ultimately had to make my decision on the law, even though I did have a hard time believing some of the witnesses, especially when there was nothing else to back it up.

(Supp. R. Vol. 1, Part 2 at 322.)

Relying on the letter from the presiding juror, Smith moved for a new trial or at the very least an evidentiary hearing based on juror misconduct, namely, juror bias in favor of the government. He claimed the fact the letter was typed showed it was written prior to the close of deliberations. And its contents revealed the presiding juror was biased in favor of the government, going so far as to call him and the Crips organization a "cancer in our society." (Supp. R. Vol. 1, Part 2 at 321.) According to Smith, that bias, considered in conjunction with the e-mail from another juror to a co-defendant's counsel, demonstrated the jury was pressured into reaching the verdict it did.

The court denied relief. It noted the verdict was split between hung counts and guilty and not guilty verdicts and reasoned:

To speculate that the presiding juror became a pseudo-prosecutor based upon his comments in his letter overlooks the verdict that was returned because the presiding juror had to vote to acquit on several charges. As such, the post-trial communication by the jurors certainly do[es] not rise to the level of misconduct, and do[es] not merit setting the verdict . . . [a]side.

(R. Vol. 1 at 290-91.)

Smith renews his juror misconduct arguments here. He again claims the district court should have granted a new trial or at the very least held an evidentiary hearing to determine whether there was actual bias.

- 29 -

"We review the denial of a motion for new trial based upon juror misconduct for an abuse of discretion." *United States v. Simpson*, 950 F.2d 1519, 1521 (10th Cir. 1991). The relevant inquiry is "whether actual bias existed or whether the circumstances compel an imputation of inherent bias to the juror as a matter of law such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."[12] *United States v. Lawrence*, 405 F.3d 888, 903 (10th Cir. 2005). "The trial court's decision as to how to proceed in response to allegations of juror misconduct or bias will [also] not be reversed absent an abuse of discretion." *United States v. Youts*, 229 F.3d 1312, 1320 (10th Cir. 2000). However, "[w]hen a party's suggestion that a jury is biased is not frivolous, the district court ordinarily should undertake an adequate inquiry into the questions of whether the bias actually existed and whether it was prejudicial." *United States v. Bradshaw*, 787 F.2d 1385, 1390 (10th Cir. 1986) (quotations omitted).

We see no abuse of discretion—either in the court's denial of the motion for new trial or its failure to hold an evidentiary hearing. First, to the extent the presiding juror's letter touches on a matter occurring during jury deliberations, it is not admissible under Rule 606(b) of the Federal Rules of Evidence. *See Benally*, 546 F.3d at 1231 (juror's testimony concerning racial bias during jury deliberations prohibited by Rule 606(b)). Even assuming we could consider the letter, it indicates a distaste for gang activity.

---

[12] In *Remmer v. United States*, the Supreme Court held: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." 347 U.S. 227, 229 (1954). Because there is no claim of juror tampering during trial, prejudice is not presumed.

Distaste for those who violate the law does not mean a juror disregarded his solemn obligation to determine whether the accused was, in fact, a lawbreaker. There is no indication the presiding juror exercised bias during deliberations. Indeed, as the court pointed out, the jury, including the presiding juror, acquitted Smith and his co-defendants on some charges. Moreover, it is pure speculation the letter was authored during deliberations. Given that the court took the verdict early on the 15th, the juror could have typed the letter after deliberations concluded on April 14.[13]

E.      Subsequent Vacation of Smith's Predicate Act Convictions

On April 17, 2007, two years before the trial in this case, Smith pled guilty pursuant to a plea agreement to one count of possession of a controlled substance with intent to distribute and two counts of distribution of a controlled substance (Case No. 06-10237-01-MB). The three counts were based on Smith's two drug transactions with Goodwyn in June 2006 and the finding of crack cocaine in the gas cap of Smith's vehicle in October 2006. The plea agreement contained no promise the government would not file any additional charges against Smith arising out of the conduct to which he was pleading guilty.[14] Smith was sentenced to 150 months imprisonment, which was later reduced to 125 months based on the retroactive application of the amendments to the crack cocaine sentencing guidelines.

---

[13] As stated previously, we are prohibited from considering the juror's e-mail to co-defendant's counsel under Rule 606(b). In any event, the letter does not indicate the presiding juror pressured that juror into finding in favor of the government; indeed, it indicates that juror made her decisions based on the law.

[14] Such promise is typical in most plea agreements.

After pleading guilty, Smith was indicted in this case and his three convictions were used as predicate acts. After unsuccessfully seeking to have the charges in this case dropped based on his plea and convictions in Case No. 06-10237-01-MB, Smith moved to vacate the three convictions in Case No. 06-10237-01-MB based on ineffective assistance of counsel. Namely, he claimed his attorney had told him his plea in Case No. 06-10237-01-MB would prevent him from being charged in this case and had he known otherwise, he would not have pled guilty. On July 19, 2010, while Smith was awaiting sentencing in this case, the court granted Smith relief in Case No. 06-10237-01-MB, vacating his three convictions and setting the case for trial. Smith subsequently moved to dismiss the case on double jeopardy and collateral estoppel grounds; the motion was denied. We affirmed. *See United States v. Smith*, No. 11-3062, 2011 WL 6739424, at *4 (10th Cir. Dec. 23, 2011) (unpublished).

Prior to sentencing in this case, Smith argued his RICO conspiracy conviction should be set aside because his convictions on the underlying predicate acts had been vacated. It is unclear whether the district court formally ruled on the issue as the record contains no such ruling. Nevertheless, the court obviously denied relief as it sentenced Smith on Count 2.

Smith repeats his argument here. He says to be convicted under 18 U.S.C. § 1926(d), the government must prove he knowingly agreed to facilitate the commission of two or more acts. At trial in this case, the government alleged the three drug transactions as the predicate acts against Smith and used his convictions to prove them. Because the jury could have based its verdict on Count 2 on the now vacated convictions, Smith says

- 32 -

his conviction on Count 2 cannot stand.

While Smith raised this issue in a sentencing memorandum (his first opportunity to raise the issue after his convictions were vacated), it is essentially an argument for judgment of acquittal. Our review is de novo. *United States v. Eaton*, 260 F.3d 1232, 1236 (10th Cir. 2001). We see no error.

In *Salinas*, the Supreme Court said there is no requirement in § 1962(d) of an overt act. 522 U.S. at 63. Therefore, a defendant can be guilty of RICO conspiracy under § 1962(d) even though he himself "does not . . . commit or agree to commit the two or more predicate acts" required to prove the substantive offense. *Id.* at 65. Thus, the fact Smith's convictions on the predicate acts were vacated does not preclude his RICO conspiracy conviction given the evidence showed other Crips members committed various predicate acts and Smith knew about and agreed to facilitate them, namely, he obtained crack cocaine from a drug house maintained by Lonnie Wade and Elton Profit (Racketeering Act 39) and engaged in a conspiracy to distribute 50 grams or more of crack cocaine (Racketeering Act 43). *See id.* at 66.

Moreover, the government did not use Smith's convictions to establish his predicate acts. Instead, it called witnesses to do so. Indeed, it was Smith, not the government, who introduced evidence of his convictions of these predicate acts. The

government's evidence, independent of Smith's prior convictions, sufficiently established the predicate acts.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge